IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL M. LENTZ,                            Case No. 14-cv-1171-pp

                        Plaintiff,

v.

CAROLYN W. COLVIN,

                        Defendant.

**DECISION AND ORDER VACATING THE FINAL ADMINISTRATIVE
DECISION OF THE COMMISSIONER, AND REMANDING FOR FURTHER
PROCEEDINGS**

## I.      INTRODUCTION

Plaintiff Daniel M. Lentz seeks judicial review of a final decision of

Carolyn W. Colvin, the acting commissioner of the Social Security

Administration (SSA). Dkt. No. 1. See also Dkt. No. 7-13 at 2-7. On July 15,

2014, the SSA's appeals council denied the plaintiff's request for a review of the

final decision of the administrative law judge (ALJ). Dkt. No. 7-3 at 2-7. This

made the ALJ's decision, Dkt. No. 7-3 at 17-33, the final decision of the

commissioner. The court vacates that decision, and remands for further

proceedings consistent with this order.

## II.     STANDARD OF REVIEW

### A.      Judicial Review

When the Appeals Council denies a plaintiff's request for review, the

ALJ's decision constitutes the final decision of the commissioner. Moore v.

1

Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Judicial review under 42 U.S.C. §405(g) is limited; the court will reverse the ALJ's decision only if the ALJ did not support his decision with substantial evidence, if he based the decision on legal error, or if he so poorly articulated the decision that he has prevented meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Id. (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be affirmed. Elder v. Astrue, 539 F.3d 408, 413 (7th Cir. 2008).

The court must review the entire record, including both the evidence that supports the ALJ's conclusions as well as evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In sum, the court will uphold the ALJ's decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).

B.     Disability Determination

The Social Security Administration provides "disability insurance benefits and supplemental security income to persons who have a 'disability.'" Barnhart v. Thomas, 540 U.S. 20, 21 (2003) (citing 42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B)). To qualify as "disabled," the claimant must demonstrate a "physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. at 21-22.  The Social Security Act further "defines 'disability' as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. at 23.

In evaluating a claim for disability benefits, the ALJ follows a five-step process, asking:

> (1) Has the plaintiff engaged in substantial gainful activity since his alleged onset of disability?
>
> (2) If not, does he suffer from a severe, medically determinable impairment?
>
> (3) If so, does that impairment meet or equal any impairment listed in the SSA regulations as presumptively disabling?
>
> (4) If not, does he retain the Residual Functional Capacity (RFC) to perform his past work?

3

> (5) If not, can he perform other jobs existing in significant numbers in the workforce?

E.g., <u>Villano v. Astrue</u>, 556 F.3d 558, 561 (7th Cir. 2009).

If it appears at any step that the plaintiff is not disabled, the analysis ends. 20 CR §404.1520(a)(4). "The plaintiff bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

## III.  DISCUSSION

### A.  <u>Facts</u>

#### 1.  *Background and Medical Opinions*

Although the plaintiff stopped working on June 15, 2005, his condition did not become severe enough to interfere with his ability to work until January 15, 2007. Dkt. No. 7-7 at 6. His condition consisted of the following mental and physical impairments: "detached retina, cataracts, depression, [and] alcohal [sic] treatments." <u>Id.</u> His treating physician, Dr. Katarzyna Zaremba, treated the plaintiff for many issues, including, but not limited to, folic acid deficiency, thyroid issues, high blood pressure, cholesterol problems, and vitamin D deficiency. <u>Id.</u> at 9.

For ten years, the plaintiff visited LensCrafters for his vision exams. <u>Id.</u> at 28. LensCrafters discovered his detached retina, and, in 2007, the Eye Associates at St. Luke's Hospital in Milwaukee performed the surgery to correct the detached retina. <u>Id.</u>; <u>see also</u> Dkt. No. 7-8 at 17. In 2011, the same facility treated the plaintiff's cataracts. Dkt. No. 7-7 at 28.

4

On an October 26, 2011 SSA "Report of Contact" form, SSA staff indicated that the plaintiff had seen a psychiatrist "about once a week" in 2008, but had stopped going because the psychiatrist had "stupid ideas," and the plaintiff had not seen a psychiatrist since that time. Id. The report indicated, however, that the plaintiff had been prescribed medication "for help with sleeping." Id.

The plaintiff's medical records reflect a variety of treatments and doctor visits. For example, in 2003, he underwent a psychological evaluation at Performance Enhancement: Behavioral Health & Counseling Services. Dkt. No. 7-8 at 2. The evaluation included analysis of the plaintiff's alcohol abuse and his paranoid and disorganized behavior. Id. at 3. The evaluation also identified his "withdrawn and isolative" personality. Id. The evaluator determined that the plaintiff demonstrated "a propensity for flawed logic" and "brief psychotic episodes with unusual behavior." Id. at 6. The evaluation also discussed the plaintiff's moderate depression and his unusual behavior when engaging with others. Id.

In 2008, the plaintiff began regularly visiting his treating physician, Dr. Zaremba. Id. at 24-25. Dr. Zaremba treated the plaintiff for numerous issues, such as hypertension, blood pressure and cholesterol problems, liver issues associated with alcoholism, hypothyroidism, vitamin B12 deficiency, reflux, "schizo type personality," mild neuropathy, anemia, kidney disease, knee pain, pneumonia, depression, hyperglycemia and insomnia. Id. at 26-113. On February 24, 2011, Dr. Zaremba evaluated the plaintiff in advance of his

5

cataract surgery, id. at 29, and at that visit, the plaintiff indicated that "he has no problems." Id. at 30.

On August 7, 2013, Dr. Zaremba completed the SSA's "Physical Residual Functional Capacity Questionnaire." Dkt. No. 7-13 at 49-55. She recounted many of the physical symptoms and treatments discussed above, and listed some psychological conditions, including depression, personality disorder, and anxiety. Id. at 49-50. The document in the record becomes difficult to read, but it appears that Dr. Zaremba suggested that the plaintiff could sit or stand and walk for only two hours of the workday due to "often" occurring pain and symptoms. Id. at 51-52. She noted that the plaintiff occasionally could lift ten or twenty pounds, but never could lift fifty pounds. Id. at 53. She observed that the plaintiff's impairments could cause him to miss work "more than three times a month." Id.

On December 20, 2011, a physician for the SSA, Dr. Donald Jacobson, performed a Residual Functional Capacity Assessment of the plaintiff. Dkt. No. 7-11 at 3. According to the assessment, the plaintiff had the following exertional limitations: he occasionally could lift or carry fifty pounds; he frequently could lift or carry twenty-five pounds; with normal breaks, he could stand or walk for six hours out of an eight-hour workday; with normal breaks, he could sit for six hours out of an eight-hour workday; and he had an unlimited ability to push and pull. Id. at 4. The RFC assessment identified no postural, manipulative, or communicative limitations. Id. at 5-7. While Dr. Jacobson noted limited "far acuity" in the visual limitations section, he

6

determined that the plaintiff had unlimited capacity in all other visual categories. Id. at 6. Dr. Jacobson opined, however, that the plaintiff "is partially credible as to severity in vision loss." Id. at 8. In terms of other physical impairments, the Dr. Jacobson determined that the "exams do not support [the] severity" alleged by the plaintiff. Id. at 10.

On December 21, 2011, a psychiatrist for the SSA, Dr. Jack Spear, evaluated the plaintiff. Id. at 11. He determined that the plaintiff had some mental impairments, but those were not severe. Id. The psychiatrist noted the plaintiff's history of depression, id. at 4, and the history of alcohol abuse, id. at 19. According to Dr. Spear, the plaintiff had no limitations in his daily living activities and had no episodes of decompensation. Id. at 21. The plaintiff did, however, experience limitations in maintaining social functioning, concentration, persistence, and pace. Id. The psychiatrist found the plaintiff's "statements about his symptoms and their functional effects . . . partially credible." Id. at 23. On July 3, 2012, the SSA's medical consultant, Dr. Howard Atkins, reviewed Dr. Jacobson's psychiatric review. Dkt. No. 7-11 at 64. Dr. Atkins agreed with Dr. Jacobson's findings and did not provide any additional comments or analysis. Id. at 64-65.

2. *Procedural History*

On April 28, 2011, the plaintiff completed his application for disability benefits. Dkt. No. 7-6 at 2. He asserted that he had become disabled on January 15, 2007, and that he remained disabled as of the application date. Id. His alleged disability included a "detached retina, cataracts, depression, [and]

alcoh[o]l treatments." Dkt. No. 7-4 at 4. On December 22, 2011, the SSA denied the plaintiff's claim for benefits, because he was "not disabled under [the] rules." Dkt. No. 7-5 at 6. As some point in 2012, the plaintiff requested that the SSA reconsider its determination, and, on July 3, 2012, the SSA found "that the previous determination denying [his] claim was proper under the law." Id. at 13.

On August 1, 2012, the plaintiff requested a hearing before an ALJ. Id. at 22. On July 5, 2013, the SSA scheduled the hearing for September 10, 2013. Id. at 37. The ALJ conducted the hearing on the scheduled date, Dkt. No. 7-3 at 41, and, on October 9, 2013, he rendered his decision, Dkt. No. 7-13 at 17. After the ALJ determined that the plaintiff was not disabled under the SSA's rules and regulations, id. at 28, the plaintiff made a "request for review of hearing decision/order" with the SSA appeals council, id. at 15. On July 25, 2014, the appeals council denied the request. Id. at 2.

On September 23, 2014, the plaintiff filed the instant complaint, seeking to appeal the final administrative determination denying his application for disability benefits. Dkt. No. 1. The plaintiff alleged that the ALJ "failed to properly evaluate [the plaintiff's] complaints of his symptoms and their limiting effects," and did not properly "state the extent that [he] found the [p]laintiff credible. Id. at ¶7. These failures meant that the ALJ did not properly "confront the evidence contrary to the agency's position." Id. (citations omitted). The plaintiff also argued that the ALJ did not make any credibility determination, but instead used "meaningless" language to describe the plaintiff's testimony.

8

Id. at ¶8 (citations omitted). According to the plaintiff, the ALJ did not support his decision with substantial evidence, or properly evaluate the physical and mental requirements of the plaintiff's past work. Id. at ¶¶9, 11-13 (citations omitted). In the brief supporting his complaint, Dkt. No. 8, the plaintiff presented five issues: (1) the ALJ made an improper credibility determination; (2) the ALJ failed to evaluate all severe impairments; (3) the ALJ improperly evaluated the treating physician's opinion; (4) the ALJ made an improper RFC determination; and (5) the ALJ improperly analyzed the plaintiff's RFC and his ability to perform past work.

### 3. *The Administrative Hearing*

On September 10, 2013, the ALJ conducted a hearing to consider the denial of the plaintiff's disability insurance benefits. Dkt. No. 7-3 at 43-72. The plaintiff's attorney gave an opening statement and emphasized that, due to his age, socialization, and troubles with paying attention, the plaintiff could not work. Id. at 45. The ALJ then examined the plaintiff. Id. at 45-54. The testimony revealed that, at the time of the hearing, the plaintiff was sixty-four years old, with a masters in energy engineering and material science from the University of Wisconsin at Milwaukee. Id. at 46. For twenty years, until June of 2005, the plaintiff worked as a systems analyst at Johnson Controls, developing, testing, and implementing in-house software. Id. at 47, 58. He lost this job when the company downsized as part of various economic decisions, and he immediately began looking for employment but never found any. Id. at 47.

9

The plaintiff testified at the hearing that the Johnson Controls job required him to work an eight-hour day, which necessitated his sitting at a desk or occasionally walking around, and which included "a couple of breaks and lunch." Id. at 52-53. Working on the software required his complete concentration, and his disabilities hindered his ability to complete tasks in a timely manner. Id. at 53.

The plaintiff testified that he became disabled in 2007. Id. at 48. At that time, he suffered a detached retina in his right eye, and he later suffered the same condition in his left eye. Id. He had surgeries to correct those issues and to correct secondary cataracts, and testified that the surgeries caused him to "probably see the best that [he] ever [has] seen," except, he noted, that he still has trouble driving at night. Id. The plaintiff described the surgeries in detail. Id. at 49-50. As a result of those conditions and surgeries, the plaintiff lost all ability to work, noting that "[i]t would have been impossible for [him] even to go to an interview." Id. at 51.

The ALJ then asked the plaintiff to describe any other health issues he experienced. Id. at 52. The plaintiff indicated that he experienced lower-back pain when sitting and upper-back pain when standing. Id. He also indicated that he "always" experiences "numbness in [his] hands" as a result of a B12 deficiency, which has no cure, and which made it difficult for him "to grasp or hold onto stuff." Id.

Next, the plaintiff described hearing difficulties. Id. He had attempted to cure that issue with hearing aids in 2002, but the devices enhanced

10

background noise to an unbearable volume and, at the time of the hearing, he could not afford newer, better options. Id.

The plaintiff's attorney then asked the plaintiff a few questions, at first focusing on some of the anti-social issues that the plaintiff experienced. Id. at 54-61. The plaintiff stated, "I've been told that I have a few anti-socialization problems, except honest, I don't notice them. It's the other people that notice them." Id. at 54. He then described it as a coping mechanism in which he would "mak[e] jokes a lot," and to the point that he would "ask [someone] to do something and then [that person] would think [he] was joking." Id. He stated that when someone "was under distress on his computer" and he made a joke, it "didn't go over at all very good." Id. at 55. At times, he made jokes that others found inappropriate, although he did not intend for it to happen that way. Id. at 55-56.

The plaintiff's attorney asked the plaintiff about his social activities outside of work. Id. at 56. The plaintiff stated that although he had served as a scout master from 1992 to about 2002, he had not been active in any clubs or social groups since that time. Id. He described a form of social anxiety when running errands, such as buying groceries, which caused his joke-telling to increase and made him shy about leaving the house. Id. at 58.

Counsel also asked the plaintiff about his concentration levels in 2005 through 2007. Id. at 57. The plaintiff stated that his concentration levels had decreased over time. For example, if he watched a sixty-minute television show, he would sometimes get to the end of the episode and not understand why

11

something had happened and would have to go back and re-watch. Id. This occurred "between 25 to 40 percent" of the sixty-minute show. Id. At work, this affected his ability to help people, especially when on the phone, and as he lost concentration, his tendency to tell jokes would increase and the people he intended to help would become impatient. Id.

The plaintiff also testified about his mental health treatment, which occurred between 2007 and 2010. Id. at 61. During that time, he received treatment at Burlington Behavior Clinic, and, after his mom died in 2011, he received treatment at a state facility. Id. From 2008 through 2009, he also took medication for panic attacks, depression and bipolar disorder. Id. at 62.

The ALJ called vocational expert (VE) Robert Neuman to testify. Id. at 65-70. The VE indicated that the plaintiff had described his work environment as requiring the plaintiff to sit for seven hours, to occasionally lift fifty pounds, and to frequently lift twenty-five pounds. Id. at 66-67. The plaintiff clarified that he "very, very seldom" lifted anything, but he sometimes had to help move computer monitors. Id. at 67. The VE asserted that the plaintiff's employment with Johnson Controls consisted of "sedentary and skilled" work as a "program analyst." Id. at 68.

The ALJ asked the VE to "consider a person the same age as Plaintiff, same education and work experience," who could "lift[] 10 pounds occasionally, five pounds frequently," could "stand[] and walk[]" for two hours, could sit for about six hours, with the inability "to perform a job that requires far visual acuity," and who "[w]ould need to work in a well-lit environment," and who

12

could not drive." Id. at 68-69. Given that description, the ALJ asked, "Could a person with those limitations perform Mr. Lentz's past work," and the VE stated, "Based on the hypothetical I would say yes." Id. at 69. The VE opined that "[t]he no contact with the public would not be a problem," although there would be a "problem . . . with the occasional contact with coworkers," and this job comes with "frequent contact with coworkers." Id. The VE stated, however, that the inability "to concentrate for 10 percent of the workday" would affect the ability to perform this job and would also make it difficult to maintain employment generally. Id.

The plaintiff's attorney asked the VE if a "restriction of only occasional use of handling and fingering[] would . . . modify [his] answer" to the ALJ's hypothetical. Id. at 70. The VE said that such a restriction would eliminate the job. Id.

4.      *The ALJ's Decision*

On October 8, 2013, the SSA sent a notice of unfavorable decision to the plaintiff. Dkt. No. 7-3 at 17. The notice included the decision and provided directions on how to appeal if the plaintiff wished to do so. Id. The ALJ indicated that he used the hearing to solicit testimony from the plaintiff and a vocational expert in an effort to determine if the plaintiff was "disabled under sections 216(i) and 223(d) of the Social Security Act." Id. at 17-33, 20.

B.      Analysis

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

13

impairment or combination . . . that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." Id. at 20. The plaintiff also must meet the requirements of §§216(i) and 223 of the Social Security Act, 42 U.S.C. §416. The ALJ in this case found that the plaintiff had remained insured until December 31, 2010 ("the date last insured"), and so noted that the plaintiff needed to "establish disability on or before that date in order to be entitled to a period of disability or disability benefits." Dkt. No. 7-3 at 20.

The ALJ determined that the plaintiff last was insured on December 31, 2010, and that his disability began on January 15, 2007. Id. at 22. For his step-one analysis, the ALJ found that from January 15, 2007 through December 31, 2010, the plaintiff did not engage in substantial gainful activity. For step two, the ALJ found that the plaintiff suffered from several severe impairments: bilateral retinal detachments, bilateral cataracts, lumbar degenerative disc disease, obesity, vitamin b12 deficiency, hypertension, hypothyroidism, stage III kidney disease, depression, and personality disorder. Id. at 22-23. Neither party objected to these portions of the ALJ's decision.

> 1. *The ALJ's finding that the plaintiff did not have any severe impairments was not supported by substantial evidence, because it fails to discuss the plaintiff's hearing loss and its effect on his ability to work.*

At step three of the five-part analysis, the ALJ concluded that the plaintiff's impairments were not sufficiently severe to qualify as listed impairments. The ALJ relied on two reports from 2011—one from January 25, 2011 and another from May 26, 2011—to determine that the plaintiff's

14

hypertension did not severely limit his ability to work. Id. at 23. The ALJ discussed medical records which indicated that the plaintiff's hypothyroidism was "well controlled." Id. With regard to the plaintiff's "abnormal liver enzymes," the ALJ noted that these seemed to be remedied when the plaintiff decreased his alcohol consumption. Id. The ALJ determined that the plaintiff's B12 shots successfully treated his B12 deficiency. Id. The ALJ discussed the fact that the medical records indicated that the plaintiff had surgery to repair an umbilical hernia and that the surgery went well, causing no "limitations or restrictions" to the plaintiff. Id. Also relying on medical records from 2011, the ALJ determined that the plaintiff suffered from an alcohol-induced atrial fibrillation with rapid ventricular response, id., but that, with treatment, "[t]he plaintiff returned to normal" and displayed "no additional evidence of severe cardiac abnormalities." Id. The ALJ concluded, on the whole, that the plaintiff's various physical impairments did "not cause more than minimal limitations with the plaintiff's ability to perform basic work activities." Id.

The ALJ next addressed the plaintiff's mental impairments, focusing on his depression and personality disorder. Id. The ALJ found that these were "not severe impairments," and considered the plaintiff's daily living activities, his social functioning, concentration and decompensation. Id. at 23-24. According to the ALJ, the plaintiff had no limitations in his daily living, because the plaintiff, although he lived alone, properly cared for a small dog, successfully checked his email, watched the news and recorded television shows, and completed household chores, including vacuuming, dishwashing and grocery

15

shopping. Id. at 23. Although the plaintiff testified about some social
difficulties, the ALJ found that the plaintiff experienced only mild limitations in
this area. Id. at 23-24.

The ALJ also determined that the plaintiff experienced mild
concentration limitations, but noted that the plaintiff could concentrate for up
to fifty minutes and could remember spoken directions if he wrote them down.
Id. at 24. The ALJ concluded that these limitations were mild. Finally, in the
area of decompensation, the ALJ found no limitations. Id. As a result, the ALJ
concluded that the plaintiff had no severe mental impairments. Id.

These physical and mental impairments, according to the ALJ, did not
meet or medically equal any of the impairments listed in the SSA's rules and
regulations. Id. While "the plaintiff had bilateral cataracts and difficulties with
vision," the ALJ found those impairments "were not severe enough to meet" any
listings in the "loss of visual acuity" category, which generally requires a
showing "that the remaining vision in the better eye after best correction is
20/20[] or less." Id. The ALJ described, in detail, the visual acuity requirements
when a plaintiff suffers from cataracts, and determined that the plaintiff did
not meet the requirements in any of the listings. Id. Also, although the ALJ
noted that the plaintiff experienced some physical impairments, he concluded
that they did not match any listings in the "vertebrogenic disorders" category.
Id. at 24-25. Finally, although the plaintiff did meet the requirements for being
obese (his BMI of 36 was higher than a BMI of 30), the ALJ concluded that the
obesity, coupled with the other impairments, both physical and mental, "did

16

not cause more than minimal limitation in the plaintiff's ability to perform basic mental work activities and were therefore nonsevere." Id. at 25.

The plaintiff argues that the ALJ "failed to properly evaluate all pertinent severe impairments . . . thus impacting [the] RFC and credibility finding." Dkt. No. 8 at 11. Specifically, the plaintiff contends that the ALJ failed to consider "Lentz's hearing problems and cervical degenerative disk disease." Id. at 12 (citing Dkt. No. 7-8 at 98; Dkt. No. 7-11 at 71; and Dkt. No. 7-12 at 615). The plaintiff also notes that the ALJ failed to include these impairments in the hypothetical presented to the VE at the hearing. Id. Finally, the plaintiff argues that the ALJ's finding that mental impairments do not affect daily activities does not equate to an ability to perform work. Dkt. No. 8 at 14-15.

The commissioner acknowledges that the ALJ did not discuss the severity of the "cervical spine condition," but asserts that the ALJ did "specifically" address "it in determining" the plaintiff's RFC. Dkt. No. 9 at 4. After 2006, according to the commissioner, the ALJ stated that the record did not contain additional evidence of back pain, and the plaintiff did not provide any "evidence to counter this finding." Id. Similarly, the commissioner argues that the plaintiff has not shown and cannot show that any hearing impairments severely impacted the plaintiff's daily life or ability to work. Id. at 5. According to the commissioner, the ALJ balanced the plaintiff's ability to complete daily, living activities with the plaintiff's mild social limitations and non-severe physical impairments. Id. at 6.

17

An August 24, 2006 radiology report indicated that the plaintiff showed "[m]ultiple level degenerative changes . . . in cervical spine." Dkt. No. 7-11 at 71. Contrary to the plaintiff's claims, the ALJ did discuss the plaintiff's back issues in his decision. The ALJ stated, "The claimant had complained of back pain infrequently, which might be related to his obesity." Dkt. No. 7-3 at 26. The ALJ went on to say,

> The claimant also testified that he was not able to perform his past job because of his back pain. However, the records show that he has not received any physical therapy or injections for his back pain. Moreover, the record does not show ongoing complaints of back pain or complaints of numbness in his hands. The medication record does not show that he has taken or is taking medication for pain, outside the use of muscle relaxants. He also is not receiving any therapy for neuropathy prior to the date last insured of December 31, 2010.

Id.

With regard to the plaintiff's "hearing problems," the plaintiff refers to a July 31, 2008 examination report in which the "Review of Symptoms" section states, "Positive for problems with hearing in his left ear. He states he has a left hearing aid but is having problems using it due to the loud background noises." Dkt. No. 7-8 at 98. That report contains no further discussion of any hearing problems. An August 2, 2012 doctor's report from an audiological evaluation found that the plaintiff had

> [m]ild sloping to profound sensorineural hearing loss in the right ear and normal hearing at 250 and 500 Hz in the left, a moderate loss at 1000 and then a precipitous drop to profound at 2000 Hz in the left ear. Poor word recognition ability in the right ear at a loud level and very poor in the left ear at a loud level.

18

Dkt. No. 7-12 at 42-43. At the September 10, 2013 disability hearing, the plaintiff testified about his hearing problems. Dkt. No. 7-3 at 52. He acknowledged that there were hearing aids that could help him, but stated that "the hearing aids now are extremely expensive and I couldn't afford to do that." Id.

The ALJ's decision does not discuss the plaintiff's hearing problems at all nor does it address how those problems might affect the plaintiff's ability to work. Nor does it discuss the impact of the plaintiff's testimony that he could not afford a hearing aid to resolve the problem.

The court concludes that while the ALJ provided a detailed overview of the plaintiff's medical history and his history of impairments, and supported many of his conclusions with substantial evidence, he failed to discuss the impact of one of the plaintiff's impairments on his ability to work. Thus the court will remand the case for further proceedings on the issue of how the plaintiff's hearing impairments impact his work ability.

> 2. *The ALJ failed to support his credibility findings with*
> *substantial evidence.*

The ALJ, following a two-step process, determined that "the plaintiff had the residual functional capacity to perform the full range of sedentary work." Id. First, the ALJ "determined whether there [was] an underlying . . . impairment . . . that could reasonably be expected to produce the plaintiff's pain or other symptoms." Id. Then, the ALJ "evaluate[d] the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent to which they limit the plaintiff's functioning." Id. This portion of the

19

analysis required the ALJ to consider the plaintiff's credibility and the medical evidence within the record. Id.

The plaintiff testified that he experienced pain and numbness in his hands, that he endured issues with his fine motor skills, had panic attacks, and struggled socially. Id. at 25. He also stated that he did "not have good visual acuity because of [various] eye conditions," that he had "shortness of breath with exertion and lower back pain," and had suffered "suicidal thoughts and depression." Id. at 25-26. The ALJ determined that the plaintiff's impairments "could reasonably . . . cause the alleged symptoms," but he did not find credible "the plaintiff's statements concerning the intensity, persistence and limiting effects of [the] symptoms." Id. at 26. The ALJ found that while the medical records showed "various difficulties with . . . vision, including retinal detachment and cataracts," it also showed "that the plaintiff's vision problems [had] improved vastly following prescribed treatments." Id.

The medical records also reflected "multilevel degenerative changes in the cervical spine and mild generative joint disease and degenerative disc disease," but the "records [were] fairly silent with regard to additional complaints of back pain." Id. The ALJ recognized that the plaintiff's obesity may have triggered some of his back pain and contributed to the plaintiff's reported inability to "lift more than 10 pounds" and his inability to "stoop, crouch or bend." Id. "However, the plaintiff's complaints have not been supported by medical findings," and the medical records do not "justify finding that [his] condition rendered the plaintiff unable to perform sedentary work." Id. Further, plaintiff's

20

"treating physician did not place restrictions on [his] activity based on his obesity." Id.

To support his conclusion that the plaintiff's residual functional capacity allowed him to perform sedentary work, the ALJ pointed to the plaintiff's ability to "continue[] to perform tasks on his computer," to "watch[] television and organize[] his books and DVDs," each of "which require visual acuity." Id. at 26-27. Because the plaintiff had stopped taking his psychiatric medications in 2008, the ALJ determined that "his allege[d] symptoms were not as limiting as the plaintiff assert[ed]." Id. at 27. Although the plaintiff testified to experiencing back pain, "the records show[ed] that he [had] not received any physical therapy or injections for his back pain," and the records did not include any evidence of "complaints of back pain or complaints of numbness in his hands." Id.

The plaintiff argues that the ALJ's credibility determination included boilerplate language that renders his decision "meaningless." Dkt. No. 8 at 7 (citing Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012)). The commissioner acknowledges that the ALJ's opinion includes the following statement:

> After careful consideration of the evidence, the undersigned finds that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons stated in this decision.

Dkt. No. 9 at 13 (citing Dkt. 7-3 at 26).

Case 2:14-cv-01171-PP   Filed 09/30/15   Page 21 of 33   Document 11

The above-quoted paragraph from the ALJ's decision in this case is the "oft-criticized boilerplate language" described as "meaningless" by the Seventh Circuit. Murphy v. Colvin, 759 F.3d 811, 816 (7th Cir. 2014). The Seventh Circuit has "repeatedly criticized" the use of boilerplate language by ALJs when making a credibility determination. Schreiber v. Colvin, 519 F. App'x 951, 961 (7th Cir. 2013). The Seventh Circuit defines "boilerplate" in the context of ALJ decisions as "a single, conclusory statement that the individual's allegations have been considered or that the allegations are not credible." Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The SSA has expressly prohibited boilerplate language in its 1996 Social Security Ruling (SSR) addressing the issue. See SSR 96-7p, available at http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html. "It is not sufficient for the adjudicator to make a single, conclusory statement" as to the claimant's credibility. Id. "The determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. Further, "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Id. An ALJ should consider daily activities, "location, duration, frequency, and intensity" of the alleged "pain and other symptoms," aggravating causes, dosages and effectiveness of the claimant's medications, any treatment the claimant has or will receive, and any other relevant factors. Id.

Case 2:14-cv-01171-PP   Filed 09/30/15   Page 22 of 33   Document 11

While acknowledging that this is, in fact, objectionable boilerplate language, the commissioner asks the court to find it a harmless error. Dkt. No. 9 at 13 (citing <u>Shideler v. Astrue</u>, 688 F.3d 306, 310-12 (7th Cir. 2012)). In contrast, the plaintiff asserts that the "ALJ's credibility determination is based on serious errors in reasoning," and thus requires remanding. Dkt. No. 8 at 6 (citing <u>Carradine v. Barnhart</u>, 360 F.3d 751, 754 (7th Cir. 2004)). The plaintiff also argues that, in determining the plaintiff's RFC, the ALJ did "not account for all of Lentz's severe and non-severe impairments." Dkt. No. 8 at 21. The failure "to consider the combined effect of all impairments when determining the RFC" requires remanding. <u>Id.</u> at 22 (citing <u>Williams v. Colvin</u>, 757 F.3d 610, 613 (7th Cir. 2014)). To which the commissioner responds that "there is no indication that the ALJ failed to consider" the combined effect, as the ALJ "discussed evidence concerning . . . visual acuity, lifting, stooping, crouching, bending, standing or walking, sitting, reaching, and gross and fine manipulation." <u>Id.</u> at 16 (citing Dkt. No. 7-3 at 25-26).

An ALJ must consider the combined effect of all of the plaintiff's impairments. <u>Alaura v. Colvin</u>, ___ F.3d___, 2015 WL 4910107 at *3 (7th Cir. Aug. 18, 2015).

> An administrative law judge is unlikely to be capable of assessing the interaction within and overall effect of such a collection of impairments; [he] is not a doctor. But [he] has access to the stable of medical consultants used by the Social Security Administration to evaluate applicants for disability benefits.

<u>Id.</u> The Social Security regulations require an ALJ "to consider the entire case record" when making a credibility determination. <u>Schreiber</u>, 519 F.App'x at

23

960. This requires that the determination "contain specific reasons for the finding on credibility, supported by the evidence in the case record. An ALJ should consider elements such as objective medical evidence of the plaintiff's impairments, the daily activities, allegations of pain and aggravating factors, functional limitations, and treatment (including medication)." Id.

The Seventh Circuit has "repeatedly emphasized that an ALJ is supposed to consider a plaintiff's limitations in performing household activities, and cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." Id. at 961 (citation omitted). However, just because an ALJ decision "is not perfect" does not render it "patently wrong." Id. It will be sufficient for the ALJ to specify "several valid reasons" for an adverse credibility determination. Id. However, "the cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

The court acknowledges that credibility determinations receive "special deference," because "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness . . . ." Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). In the Seventh Circuit, courts "will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." Id. Only when the ALJ's decision "lacks any explanation or support" will the reviewing court "declare it to be patently wrong and deserving of reversal."

24

<u>Schreiber</u>, 519 F. App'x at 960. The court also acknowledges that "the use of [boilerplate] language is not fatal if the ALJ has otherwise explained his conclusion adequately." <u>Id.</u> 961 (quotation marks and citation omitted).

The ALJ's decision makes statements such as, "the objective findings . . . fail to provide strong support for the claimant's allegations," Dkt. No. 7-3 at 26, and "[t]he claimant's complaints have not been supported by medical findings," <u>id.</u>, and "consideration of the [SSA] factors  . . . leads to a conclusion that the claimant's allegations of disabling symptoms and limitations cannot be fully accepted . . . ," <u>id.</u> These statements, however, do not constitute the specific findings required by the Seventh Circuit. They are not sufficient to let the parties and the reviewing court know which particular facts caused the ALJ to doubt the plaintiff's credibility on which particular issues. Further, as the court found in Section B.1. above, the ALJ failed to consider the impact of the plaintiff's hearing loss on his ability to do sedentary work. Accordingly, the court will remand the case for further findings regarding the ALJ's determination that the plaintiff was not credible.

3. *The ALJ failed to give "good reasons" for deciding not to give the opinion of the treating physician controlling weight.*

The ALJ specifically addressed the records of Dr. Zaremba, the plaintiff's treating physician. <u>Id.</u> Dr. Zaremba had asserted "that the plaintiff can stand/walk for no more than 2 hours and sit for no more than 2 hours in an 8-hour day," but the ALJ found that this report had "no relation to the objective medical evidence." <u>Id.</u> Likewise, Dr. Zaremba's reports of "gross and fine manipulations and reaching," which the doctor limited to 5% of the work day,

25

did not align with the objective medical evidence. Id. The ALJ also found that Dr. Zaremba's "assessment of marked limitation in concentration, persistence and pace, social functioning, constant episodes of decompensation [were] inconsistent with the lack of mental health treatment and the discontinuance of psychiatric medications." Id. Finally, the ALJ concluded, "Dr. Zaremba's report does not address plaintiff's limitations during relevant period and he does not specialize in treating psychiatric disorders." Therefore, the ALJ gave "his opinion . . . minimal weight." Id.

The ALJ also evaluated the evidence provided by the state's medical and psychological consultants, which ALJs "treat[] as opinion evidence." Id. The state physician found that the plaintiff could "perform medium work," but the ALJ gave this "little weight," because "the plaintiff's degenerative disc disease, obesity, and . . . subjective complaints" showed that he had "greater exertional limitations." Id. The ALJ gave "great weight," however, to the state physician's evaluation of the plaintiff's visual limitations, because they were consistent with the medical evidence. Id.

The plaintiff asserts that the ALJ erred by failing to give the treating physician's opinion controlling weight. Dkt. No. 8 at 18 (citing Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. §404.1527; SSR 96-2p). The commissioner responds that Dr. Zaremba's opinion, as stated in the Physical Residual Functional Capacity Questionnaire, Dkt. No. 7-13 at 49-55, did not address "the relevant period," such that the ALJ did not have to give it controlling weight. Dkt. No. 9 at 9.

26

This case focuses on the plaintiff's condition from 2007 through 2010. According to the commissioner, the Physical Residual Functional Capacity Questionnaire completed by Dr. Zaremba addressed the plaintiff's physical capabilities as of the date the doctor completed the form, or 2013. Dkt. No. 9 at 9. Thus, the commissioner argues, Dr. Zaremba's report did not provide relevant information regarding the plaintiff's condition from 2007 through 2010. But the Seventh Circuit has placed a duty on ALJ's to "obtain a 'retrospective diagnosis.'" Blom v. Barnhart, 363 F. Supp. 2d 1041, 1048-49 (E.D. Wis. 2005) (quoting Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998)). Further, if an ALJ rejects a treating physician's opinion, he must provide "good reasons" for doing so. Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010).

The medical records in this case demonstrate that the plaintiff regularly visited Dr. Zaremba from 2008 through 2011. The medical opinion of a treating source is entitled to controlling weight if the opinion meets a two-part test: it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence in the case record . . . ." SSR 96-8p; SSR 96-2p; 20 C.F.R. § 404.1527(d)(2); Patterson v. Barnhart, 428 F. Supp. 2d 869, 882-83 (E.D. Wis. 2006). The ALJ may discount a treating physician's opinion "if it is inconsistent with the opinion of a consulting physician . . . or when the treating physician's opinion is inconsistent with substantial evidence in the record." Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). Social Security Regulation 96-2p explains that the term "not inconsistent" does not require that a well-supported

27

treating source's opinion be consistent with all the other evidence. Instead, it requires that there is no other substantial evidence in the record that contradicts or conflicts with the treating source's opinion. SSR 96-2p. Substantial evidence is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion. Depending upon the facts of a given case, any kind of medical or nonmedical evidence can potentially satisfy the substantial evidence test." Id. The contradictory opinion of a non-examining physician is not sufficient by itself to allow the ALJ to reject the opinion of a treating source. Gudgel, 345 F.3d at 470.

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. §404.1527). Thus, if the ALJ determines that the opinion of a treating source is not entitled to controlling weight, the ALJ must consider whether it is still entitled to some level of deference using the factors set forth in 20 C.F.R. §404.1527. SSR 96–2p. "The ALJ is not required to mechanically walk through all of the §1527(c) factors, but he must explain each factor that is material to his decision." Roningen v. Colvin, No. 13-CV-550, 2013 WL 4926236 at *6 (W.D. Wis. Sept. 30, 2014). An ALJ must offer "good reasons" for discounting the opinion of a treating physician and build a logical bridge

28

from the evidence to his conclusion. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013); Martinez v. Astrue, 630 F.3d 693, 698 (7th Cir. 2011).

The Seventh Circuit has explained that the treating source rule is like a "bursting bubble presumption"—when contrary evidence is introduced, "the rule drops out and the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). In Hofslien, the Seventh Circuit explained that a treating physician has an advantage

> over other physicians whose reports might figure in a disability case [because] he has spent more time with the plaintiff. The other physicians . . . might never even have examined the plaintiff (that was true here), but instead have based their evidence solely on a review of hospital or other medical records.

Id. Yet, that court also recognized that, "as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits. Id. However, regardless of the source of a medical opinion, the ALJ must evaluate all the evidence in the record to determine the extent to which a medical opinion is supported by the record and to decide what weight to give it. 20 C.F.R. §404.1527(c); SSR 96-5p.

In this case, the ALJ did not give Dr. Zaremba's findings controlling weight, because he determined that her findings did not align with the objective medical evidence. The ALJ did not explain in his decision, however, with which objective medical evidence Dr. Zaremba's findings did not align. The court also finds that the ALJ failed to develop a "retrospective diagnosis," even though the

29

record contained numerous documents illustrating the plaintiff's treatment with Dr. Zaremba during the relevant time period. The court thus concludes that the ALJ failed adequately to explain his rationale for deciding not to give the treating physician's opinion controlling weight. The court will remand the case for further proceedings on this question.

4.     *Because additional errors undermine the court's confidence in the ALJ's decision, the court will remand the decision for further development of the VE's testimony.*

The ALJ found that the plaintiff could perform his past relevant work as a program analyst, and that his RFC did not preclude him from performing that work. Dkt. 7-3 at 27. The ALJ relied on the vocational expert's finding that someone with the plaintiff's impairments, physical and mental, could perform this type of work, and deemed the VE reliable. Id. at 27-28. Therefore, according to the ALJ, the plaintiff was not disabled. Id. at 28.

The plaintiff argues that in determining that the plaintiff could perform past work, "the ALJ relied on incorrect information from the VE." Dkt. No. 8 at 24. The plaintiff argues that the VE incorrectly categorized the plaintiff's past work as sedentary despite the plaintiff's testimony that he had to "lift[] between 25 and 50 pounds," which meant that the past work was "a medium occupation," and not sedentary. Id. at 24-25 (citing 20 C.F.R. §404.1567(a)-(c)). The plaintiff asserts that the ALJ and the VE failed to "list the specific physical requirements of the previous job and assess, in light of the available evidence, the plaintiff's ability to perform these tasks.'" Id. at 26 (quoting Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991)). The commissioner responded by

pointing to the plaintiff's testimony that he "'very, very seldom'" lifted twenty-five pounds or more. Dkt. No. 9 at 16 (quoting Dkt. No. 7-3 at 66).

The ALJ posed the following question to the VE:

> All right, please consider a person the same age as Mr. Lentz, same education and work experience, with the following limitations. Lifting 10 pounds occasionally, five pounds frequently. Standing and walking capacities two hours, sitting capacity six hours. He would be unable to perform a job that requires far visual acuity. Would need to work in a well-lit working environment. No driving. Could a person with those limitations perform Mr. Lentz's past work?

Dkt. No. 7-3 at 68-69. When the VE responded in the affirmative, the ALJ modified the question some: "What if the person were unable—no contact with the general public, if we add that limitation, and no more than occasional contact with coworkers and supervisors, could he perform his past work?" Id. The VE found that no public contact was not problematic, but opined that the plaintiff likely would have frequent contact with co-workers. Id. As a final modification, the ALJ asked, "Okay, and if the same person were unable to concentrate for 10 percent or more of the workday, could they perform his past work?" Id. The VE responded in the negative. Id.

"Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence. This does not mean that every limitation alleged by the plaintiff must be included—only those supported by the evidence." Wates v. Barnhart, 274 F. Supp. 2d 1024, 1040 (E.D. Wis. 2003) (internal citation omitted). A court, however, "need not remand in search of the perfect hypothetical questions." Id. But, "when additional errors

31

undermine the court's confidence in the ALJ's decision, remand is appropriate for this purpose as well." Id. at 1040-41 (citing Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002)). A court may remand when the ALJ "elicit[s] incomplete testimony from the vocational expert." Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).

In Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002), the Seventh Circuit chastised an attorney who failed to question the VE during a hearing about a discrepancy in data presented at the hearing. Id. at 446. The failure to question the VE's "foundation or reasoning . . . entitled [the ALJ] to accept the vocational expert's conclusions." Id. The Seventh Circuit noted that the SSA only required an ALJ to explain a discrepancy in the VE's testimony if the parties had identified that discrepancy at the hearing. Id. at 447. "Raising a discrepancy only after the hearing . . . is too late. An ALJ is not obliged to reopen the record." Id.

In addition to his other objections, the plaintiff objects to the form of the hypothetical question the ALJ posed, and the VE's failure to incorporate the proper work level into his hearing testimony. The court notes that the plaintiff's attorney had an opportunity to question the VE at the hearing and did not raise these discrepancies at that time. But the other errors the court has identified above call into question some of the ALJ's conclusions. Accordingly, the court will remand on this issue, for a more definitive finding as to whether the plaintiff could perform his past work based on a "medium occupation," and

if the ALJ determines that the plaintiff's past work truly was "sedentary," a more detailed explanation of the basis for such a finding.

## IV.    CONCLUSION

The court **ORDERS** that the decision of Carolyn W. Colvin, Acting Commissioner of Social Security, denying the plaintiff's application for disability benefits is **VACATED.** The court **REMANDS** the case for further proceedings consistent with this opinion.

Dated in Milwaukee, this 30th day of September, 2015.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge

33